UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

CAITLIN BYRNE                                                                    **COMPLAINT**
                                                                                 **JURY TRIAL DEMANDED**

                                                Plaintiff,

                        -against-


THE AMERICAN SOCIETY FOR THE
PREVENTION OF CRUELTY TO ANIMALS
(ASPCA), DARA RUIZ, COLLEEN DOHERTY
and ANTONIA VITALE,
                                                Defendants.

-----------------------------------------------------------------X

        Plaintiff, CAITLIN BYRNE  by her attorney, Fred Lichtmacher of The Law Office of Fred

Lichtmacher P.C., complaining of the defendants herein, respectfully alleges as follows:

                            **JURISDICTION AND VENUE**

1.      This action arises under federal law, more specifically pursuant to Title VII, 42 U.S.C. §§

        2000e et seq, and the New York City Administrative Code Section 8-107 et seq.

2.      Pursuant to 28 U.S.C. §1391(b)(2), venue is proper in the Eastern District of New York, as

        events forming the basis of the Complaint occurred in this District and subject matter

        jurisdiction is conferred pursuant to 28 U.S.C. §§ 1331 and 1343 (a) (3 & 4) and

        supplemental jurisdiction is conferred for plaintiff's NYC HRL claims via 28 U.S.C. §

        1367.

                                    **PARTIES**

3.      At all times relevant plaintiff CAITLIN BYRNE, was a resident of the City and State of

        New York in the County of Queens and she identifies as a Black female.

                                        -1-

4.     At all times relevant CAITLIN BYRNE was employed as a Community Engagement
       Coordinator (CEC) with American Society for the Prevention of Cruelty to Animals,
       hereinafter the "ASPCA" in New York City.

5.     Upon information and belief, defendant the ASPCA was and is a municipal not-for-profit
       corporation organized and operating under New York State law with its primary place of
       business in New York situated at 424 East 92nd Street, New York, NY 10128 and the
       ASPCA maintains a location in Long Island City, Queens New York at which the plaintiff
       worked.

6.     At all times relevant, the ASPCA employed the individual defendants Dara Ruiz, Colleen
       Doherty and Antonia Vitale.

7.     At all times relevant, defendants Dara Ruiz and Colleen Doherty held supervisory roles
       within the ASPCA, and both held supervisor capacity over the plaintiff.

8.     Upon information and belief, defendant Antonia Vitale was the ASPCA's HR
       representative for the plaintiff's department.

9.     ASPCA  is an employer for purposes of Title VII of the Civil Rights Act of 1964 42
       U.S.C. § 2000e(b) and ASPCA is the "employer" of the plaintiff and of the defendants and
       upon information and belief the ASPCA employees over 500 individuals.

10.    The ASPCA is liable for acts committed by the defendants, which violate Title VII as well
       as for acts violating the NYC HRL including § 8-107(13)(b).

11.    Caitlin Byrne filed a complaint with the EEOC on March 02, 2022 alleging discrimination
       premised on her gender and race.

12.    On September 22, 2022 Ms. Byrne  received a right to sue letter from the EEOC.

13.    This Complaint is filed within 90 (ninety) days of receipt of the right to sue letter.

**Nature of the Claim**

14.    The plaintiff brings this complaint due to the severe and pervasive racial discrimination she faced on her job with ASPCA by her direct supervisors and other employees who had control of the terms and conditions of her employment.

**FACTS UNDERLYING**
**PLAINTIFF'S CLAIMS FOR RELIEF**

15.    Caitlin Byrne was hired by the ASPCA in June of 2018 as a Community Engagement Coordinator (CEC) and she remained employed by the ASPCA until December 2021, when she was placed on paid leave, and then ultimately terminated in March of 2022.

16.    At the time of her hiring, upon information and belief, Ms. Byrne was the only Black female in her department and all of her supervisors were Caucasian.

17.    Ms. Byrne began noticing the adverse treatment and lack of opportunities presented to her in comparison to her Caucasian co-workers in the beginning of 2020.

18.    The management team, specifically her direct supervisor, defendant Dara Ruiz, were passing over Ms. Byrne for promotions and opportunities that she was well qualified for and in which she was interested.

19.    These positions and opportunities were instead given to Caucasian employees who had less experience and upon information and belief were less qualified than the plaintiff and less time on the job.

20.    In addition to being passed over for opportunities for  promotion, Ms. Byrne was denied opportunities within her role as a Community Engagement Coordinator such as leading

external trainings and planning the annual National Night Out event, which was an honorary duty of her job position, and would have given her a chance to showcase her skills and leadership to upper management, both of which were given to Caucasian employees in the same position as Ms. Byrne, but who had less experience and less time on the job.

21.    Upon information and belief, these opportunities were something that most CECs would get the opportunity to do as a way to advance their professional development, and which usually were given to those such as Ms. Byrne who had more time on the job, and who showed interest.

22.    Ms. Byrne not only showed interest in these opportunities but also went as far to enroll in a Data Analytics program in order to advance within the ASPCA.

23.    Ms. Byrne showed an exemplarily work ethic and dedication to her role at the ASPCA, and throughout her employment she was given positive written and verbal feedback regarding her performance from supervisors outside of her department, and was aware that the feedback was being presented to her direct supervisors, who still chose to ignore the quality of Ms. Byrne's work and discriminate against her by treating her differently and worse than similarly situated Caucasian employees.

24.    At one point, Ms. Byrne had a meeting with the Senior Director of the Community Engagement team, defendant Colleen Doherty, in which she was inappropriately told by defendant Doherty that "she needed to stop asking for more opportunities with data work, and to stop asking for professional development".

25.    The meeting was requested by the plaintiff to express her concern over her work being

claimed by another employee, but defendant Doherty instead used it as an opportunity to hold her back from expecting the same opportunities as other similarly situated Caucasian employees and criticize Ms. Byrne unnecessarily.

26. Ms. Byrne began to be ignored by her coworkers and managers in group collaboration settings, and her ideas were pushed aside.

27. Ms. Byrne began to receive undue criticism from her manager, for mistakes Dara Ruiz was fully aware were made by other employees.

28. Additionally, Dara Ruiz criticized plaintiff's work when it was performed in the same manner as the work performed by other similarly situated Caucasian employees who were also supervised by Ms. Ruiz and who upon information and belief were not criticized for performing in a similar manner.

29. Ms. Byrne was doing all of the required duties of a CEC, and often more than what was required as a way to pick up the slack for other team members.

30. Even though Ms. Byrne was not the supervisor of her team, or responsible for other employee's actions, she was criticized and reprimanded for others' mistakes by Dara Ruiz, this was treatment to which other similarly situated Caucasian employees were not subjected.

31. At one point in 2020, for approximately two months, the Community Engagement Department experienced a shortage of staffing.

32. Ms. Byrne remained on the team and was given additional responsibilities as she was at that point in time the only CEC in the department, but was not given any additional compensation or benefits for the additional tasks she was expected to perform but which

extended well outside of her job duties.

33.   There were multiple instances in which Ms. Byrne was expected to work double shifts, even though she had an early start time to her shift the next day, and when other similarly situated Caucasian employees were in that position, they were typically allowed to end their shifts early to rest adequately for the next day; Ms. Byrne was never granted that privilege by defendant Ruiz.

34.   The department was relying on Ms. Byrne and implementing her ideas and work, without giving her any support or resources during and after the staffing shortage period.

35.   During this time, Dara Ruiz began to harass Ms. Byrne frequently including but not limited to in the following manners:

36.   Dara Ruiz would re-direct Ms. Byrne's schedule without informing her of the changes, and direct Ms. Byrne to do certain tasks that took time away from her being able to prioritize her actual assignments, something which was not being done to Caucasian employees.

37.   Dara Ruiz would lash out at Ms. Byrne and yell at her on the job, including stating "You (insinuating Ms. Byrne) are lucky you even have this job", even though Ms. Byrne was more than qualified for the position, and telling her "You need to get it together, it's called being an adult" something which upon information and belief was not done to Caucasian employees.

38.   These verbal attacks were unprompted and upon information and belief, were not happening to any Caucasian employees nor were they merited.

39.   Dara Ruiz began harshly criticizing Ms. Byrne's work, even though the department was happy with it and benefitting from it.

40. Dara Ruiz purposefully excluded Ms. Byrne from department projects that would have been beneficial to the progression of Ms. Byrne's career and which would have been expected to be participated in by someone in plaintiff's position.

41. Dara Ruiz would ignore Ms. Byrne in group settings, and ignore the work that Ms. Byrne contributed to meetings and projects, something she did not do to Caucasian employees.

42. Dara Ruiz would deny Ms. Byrne the ability to work on the development of projects that originated from Ms. Byrne's work.

43. In January of 2021 Ms. Byrne sought help to file an HR complaint against Dara Ruiz as she could no longer tolerate the disparate treatment to which she was being subjected.

44. Ms. Byrne met with Antonia Vitale, the CE Team People Person Representative (HR) who recommended Ms. Byrne have a meeting with Dara Ruiz and herself.

45. Ms. Byrne prepared a list of talking points for the meeting and sent it to defendant Vitale in preparation for the meeting.

46. The following day, Ms. Byrne received a behavioral write up for the first time in her career from Defendant Ruiz.

47. Ms. Byrne was able to successfully defend the claims in the write-up, proving that they were not accurate, and entirely fictitious.

48. The fictitious write-up was overtly retaliatory as it was generated a day after Ms. Byrne reached out to HR to file a complaint.

49. In the following days, Ms. Byrne had a meeting with defendants Vitale and Ruiz, from which nothing came, even though Ms. Byrne clearly described her history of disparate treatment and retaliation from Dara Ruiz.

50. Two months later, in March of 2021, Ms. Byrne applied for an open role as a Program Data Specialist (PDS) with a different department within the ASPCA.

51. Ms. Byrne was qualified for the role, and made it through three interview rounds successfully.

52. The role would be a promotion, including a pay raise, and a more advanced work load, allowing Ms. Byrne to advance in the direction she had hoped to within the ASPCA, and have her transferred to a different department, which would have relieved her from the discrimination she was being subjected to by the defendants.

53. On April 19, 2021, six days after Ms. Byrne's final interview for the PDS role, and before a decision was made on which candidate would be hired for the role, Ms. Byrne received an email that was not intended for her viewing.

54. The email was a correspondence between Dara Ruiz, Colleen Doherty, and Antonia Vitale, on which they were discussing the best way to generate another write-up against Ms. Byrne.

55. Ms. Byrne disputed the claims in the write-up, but it cost her the PDS role.

56. The role was given to a Caucasian male, who upon information and belief, had less skills and qualifications for the role than Ms. Byrne.

57. On a Zoom call with Antonia Vitale, Ms. Byrne expressed her emotional distress and state of overwhelm due to the harassment and lack of support, to which Antonia Vitale responded by acknowledging that Dara Ruiz' behavior was inappropriate but "not illegal".

58. Ms. Byrne inquired about a transfer to a different department or work placement, but was told no such opportunities existed.

59.  Around this time, after her Zoom call with Antonia Vitale, Ms. Byrne was also notified

that the HR investigation she prompted against Dara Ruiz was closed in favor of Dara

Ruiz.

60.  Ms. Byrne became very stressed in her work environment, and felt little to no support from

her administrative staff and management.

61.  Ms. Byrne felt as though she was a target for adverse treatment, and felt terrified of

working under Dara Ruiz, who clearly showed a disdain for Ms. Byrne for no legitimate

reason.

62.  In November of 2021, the role Mrs. Byrne previously applied for in March, the Program

Data Specialist was once again opened up.

63.  Ms. Byrne applied for the position, informing her direct manager, Dara Ruiz that she had

applied.

64.  The hiring manager for the role acknowledged Ms. Byrne's application, and informed her

that she would follow up with Ms. Byrne in the coming week.

65.  Before the week had ended, and before Ms. Byrne heard back from the hiring manager,

Ms. Byrne was informed by Dara Ruiz, Antonie Vitale, and Colleen Doherty, that Ms.

Byrne was being placed on a performance probation period, effective immediately.

66.  The performance probation prohibited Ms. Byrne from being eligible for any open roles

within the ASPCA.

67.  Ms. Byrne once again lost out on the promotion and ability to advance her career, as she

was no longer eligible for the PDS role.

68.  At this point, Ms. Byrne was unable to tolerate the mounting discrimination, harassment,

and retaliation she was facing, and felt that management and her supervising HR support were purposefully denying her opportunities and going out of their way to make Ms. Byrne's job more difficult.

69.   Beginning on December 9th, 2021, Ms. Byrne was on a continuous leave of absence under her doctors recommendation, after an 8 hour emergency room visit, which was caused by her inability to continue to tolerate the stress and anxiety that resulted from the abuse and discrimination she was subjected to at the ASPCA.

70.   On December 13, 2021 Ms. Byrne sent an email to Matt Bershadker, the CEO of the ASPCA outlining her experience with her supervisors but never received a response.

71.   Ms. Byrne was told that while she was on leave, the ASPCA would try to find alternative opportunities for her, in a different department.

72.   The only jobs presented to Ms. Byrne were either completely below her skill set, and would include a pay decrease, or positions for which she clearly did not qualify.

73.   Around this time, Ms. Byrne learned that defendant Dara Ruiz received a promotion.

74.   Ms. Byrne's leave was extended until March 26, 2022, when according to an ASPCA employer, "we will proceed with your separation from employment".

75.   In response to that message, and the lack of accommodations Ms. Byrne was experiencing, including the lack of support regarding a transfer to a different department, she wrote an email to some of her direct teammates wishing them well and thanking them for the experience, knowing her employment was going to be terminated in the upcoming days.

76.   ASPCA responded immediately stating that Ms. Byrne resigned, and they would make her resignation effective that day.

77.   Ms. Byrne responded to the email stating that it was not a resignation letter, it was a goodbye note to some of the colleagues she worked with at the ASPCA.

78.   In response, the ASPCA wrote "In any event, whether it is characterized as your voluntary resignation or as your involuntary separation, you have now been separated from employment with the ASPCA."

79.   Ms. Byrne was wrongfully terminated from the ASPCA based on her race.

80.   At a bare minimum Ms. Byrne was constructively terminated from her employment as she was either forced out or fired.

81.   Ms. Byrne was treated differently and worse, than similarly situated Caucasian employees at ASPCA.

82.   Ms. Byrne was not given opportunities that Caucasian employees were given at the ASPCA.

83.   It also came to Ms. Byrne's attention that other people of color (POC) employees were also experiencing disparate treatment at the ASPCA.

84.   A POC woman on the CE team was experiencing similar treatment as was the plaintiff at the hands of defendant Ruiz, including dismissive comments, and upon information and belief, this person reached out to HR at one point to complain of not being able to handle the treatment but did not get support and was terminated abruptly.

85.   A Black man in the community medicine department, adjacent to plaintiff's department, complained of not being promoted, even though he worked for the ASPCA for ten years, and upon information and belief, was put on leave and fired regarding a false complaint made against him that he was not given the chance to dispute.

86. Upon information and belief, a Black female veterinarian at the ASPCA was up for a promotion, and felt as though she was given the run around from ASPCA, making it more difficult and requiring more than typical effort in trying to get the promotion she was eligible for, but which she ultimately did not get.

87. A Black female that was hired during the diversity and inclusion program at the ASPCA expressed to plaintiff her frustrations at experiencing worse treatment than Caucasian employees and at one point commented privately to the plaintiff that they "were low hanging fruit in the office", referring to herself and the plaintiff.

88. Ms. Byrne was the subject of frequent microaggressions including a comment about the texture of her hair, by a manager of the adjacent department, who commented "your hair looks damaged, you should fix it" referring to the "edges" of Ms. Byrne's hair, a common characteristic of Black people's textured hair.

89. Ms. Byrne was being ignored by her supervisor, especially in group settings, was not granted privileges that other similarly situated Caucasian employees were given, and being passed over for opportunities which should have been given to her.

90. Ms. Byrne brought up the comment regarding her hair to her supervisor, defendant Ruiz, who dismissed the comment which Ms. Byrne found to be overtly racist and insulting.

91. Ms. Byrne experienced severe retaliation when she spoke out about her treatment, which included the sabotage of her career advancement by her supervisors and HR.

92. Ms. Byrne was aware of the drastically different treatment that POC were given at the ASPCA and was not able to tolerate working in an environment riddled with severe and pervasive discrimination.

-12-

93.  As a direct consequence thereof, the plaintiff has been damaged: among other harms she endured, she suffered from emotional harms including anxiety, distress, depression, suicidal ideation, panic attacks and she was at one point hospitalized for 8 hours as a result, the racism to which she was subjected made it unduly difficult for her to do her job, and she was ultimately fired from her job, resulting in a three month period of unemployment.

94.  The plaintiff thereby had her rights violated due to her being a Black woman.

**AS AND FOR A FIRST CAUSE OF ACTION
ON BEHALF OF PLAINTIFF
AGAINST THE ASPCA
VIOLATION OF PLAINTIFF'S RIGHTS
PURSUANT TO TITLE VII, 42 U.S.C. §2000e-2(a) (1 & 2)**

95.  Plaintiff repeats, reiterates and reallege each and every allegation contained in the prior paragraphs with the same force and effect as is more fully and at length set forth herein.

96.  The defendant, ASPCA, caused, created, maintained and tolerated a hostile work environment riddled with racial prejudice including discrimination against the plaintiff, Caitlin Byrne, a Black woman in violation of Title VII 42 U.S.C. §2000e-2(a) (1 & 2).

97.  Caitlin Byrne was treated differently and worse than similarly situated white employees by her supervisors, and by the upper management/human resources of ASPCA. i.e. in violation of her rights protected by Title VII.

98.  Ms. Byrne has been deprived of the same terms and conditions of employment afforded to white employees due entirely to her being a Black female.

99.  Defendant ASPCA has known of the disparate treatment POC individuals were subjected to, and in particular, the disparate treatment the plaintiff has been subjected to, and did not

-13-

take action to remedy the situation.

100. Among other methods of disparate treatment, Caitlin Byrne has been denied a tolerable work environment, she was subjected to a different and worse terms and conditions of her employment than other similarly situated white employees, plaintiff has been damaged: among other harms she endured, she suffered from emotional harms including anxiety, distress, depression, suicidal ideation, and panic attacks and was at one point hospitalized for 8 hours as a result, she had a difficult time focusing at work, and was ultimately fired from her job, resulting in a three month period of unemployment, she was unable to sleep at night, she lost her appetite, and it was difficult for her to work.

101. As a result of the defendant ASPCA'S disparate and worse treatment of the plaintiff, she is entitled to compensatory damages in the amount of $300,000, an award of punitive damages to be determined by the trier of fact as well as separate awards for economic damages and an award of reasonable attorney's fees and costs is appropriate pursuant to 42 U.S.C. § 2000e-5(k).

**AS AND FOR A SECOND CAUSE OF ACTION
ON BEHALF OF PLAINTIFF
VIOLATION OF THE PLAINTIFF'S RIGHTS
PURSUANT TO THE ADMINISTRATIVE
CODE OF THE CITY OF NEW YORK §8-107(1)(a) et seq.**

102. Plaintiff repeats, reiterates and realleges each and every allegation contained in the prior paragraphs with the same force and effect as is more fully and at length set forth herein.

103. By the actions described *supra*, the plaintiff was deprived by the defendants of rights secured by the New York City Administrative Code§8-107 (1)(a) et seq., including, but not limited to her right to be free from discrimination based on race.

-14-

104.    In violation of §8-107 (1)(a), plaintiff's employer, ASPCA and fellow employees, defendants Dara Reyes, Colleen Doherty, and, Antonia Vitale because of Ms. Byrne's race, discriminated against her, including depriving her of the working conditions and terms and conditions of employment given to white employees and they otherwise adversely affected her status and the terms and conditions of her employment because of her race.

105.    As a direct consequence thereof, the plaintiff has been damaged; among other harms she endured pecuniary damages; she suffered emotional harms; she was hospitalized for a panic attack and has suffered depression and suicidal ideation; she was unable to sleep at night, she lost her appetite, and it was difficult for her to work and she has been treated differently and worse than similarly situated white employees.

106.    Ms. Byrne was told that she should apply to other positions within the ASPCA to avoid having to see the defendant's, but offered her no viable options other than ones which would require that Ms. Byrne take a demotion and pay cut.

107.    The plaintiff is therefore entitled to compensatory damages in amounts not to exceed ONE MILLION ($1,000,000.00) DOLLARS and an award of punitive damages in an amount to be determined by the trier of fact and she is entitled to an award of reasonable attorneys' fees and costs pursuant to New York City Administrative Code §8-502(a & g).

**AS AND FOR A THIRD CAUSE OF ACTION
ON BEHALF OF PLAINTIFF
FOR VIOLATION OF
PLAINTIFF'S RIGHTS UNDER THE ADMINISTRATIVE
CODE OF THE CITY OF NEW YORK§8-107 (7) (I)**

108.  Plaintiff repeats, reiterates and realleges each and every allegation contained in the prior paragraphs with the same force and effect as is more fully and at length set forth herein.

109.  By the actions described, plaintiff, was deprived of her rights secured by the New York City Administrative Code §8-107 (7) in that she was retaliated against by the defendants because she opposed and complained about practices forbidden under §8-107(1) as well as other illegal practices of the defendants.

110.  Caitlin Byrne contacted her HR representative, Antonia Vitale in January 2021 to file an official complaint against her supervisor, Defendant Dara Ruiz for the disparate treatment she was being subjected to due to her race.

111.  Immediately after Ms. Byrne initiated the complaint, defendants Dara Ruiz, Colleen Doherty, and Antonia Vitale began to retaliate against Ms. Byrne by purposefully interfering with her future career prospects, blocking her from promotions, generating fictitious reports against Ms. Byrne, and other retaliatory behavior.

112.  One day after filing the complaint with defendant Vitale, Ms. Byrne received a behavioral write-up for the first time in her career, which was generated by defendants Vitale and Ruiz.

113.  Defendants Vitale and Ruiz generated a write-up using false information, and Ms. Byrne was able to dispute all of their claims.

114.  When Ms. Byrne applied for a promotion she was very well qualified for within the ASPCA, Dara Ruiz and Antonia Vitale generated a fictitious write-up against Ms. Byrne.

115.  When Ms. Byrne challenged the allegations set forth in the write-up, defendant Ruiz became more aggressive and rude towards the plaintiff.

-16-

116.    After admitting that defendant Ruiz' behavior towards the plaintiff was "inappropriate but

        not illegal", Vitale closed the HR investigation Ms. Byrne filed against Dara Ruiz, in favor

        of defendant Ruiz.

117.    As a direct consequence thereof, the plaintiff has been damaged; among other harms she

        endured, she suffered from emotional harms including anxiety, distress, depression,

        suicidal ideation, and panic attacks and was at one point hospitalized for 8 hours as a

        result, she had a difficult time focusing at work, and was ultimately fired from her job,

        resulting in a three month period of unemployment, she was unable to sleep at night, she

        lost her appetite, and it was difficult for her to work.

118.    The plaintiff is therefore are entitled to compensatory damages amounts not to exceed

        ONE MILLION ($1,000,000.00) DOLLARS and punitive damages in amounts to be

        determined by the trier of fact and she is entitled to an award of reasonable attorneys' fees

        and costs pursuant to New York City Administrative Code §8-502(a & g).

**AS AND FOR A FOURTH CLAIM FOR RELIEF
ON BEHALF OF PLAINTIFF
AGAINST THE DEFENDANT ASPCA FOR VIOLATING
PLAINTIFF'S RIGHTS UNDER THE ADMINISTRATIVE
CODE OF THE CITY OF NEW YORK §8-107 (13) (b)**

119.    Plaintiff repeats, reiterates, and realleges each and every allegation contained in the prior

        paragraphs with the same force and effect as is more fully and at length set forth herein.

120.    The defendant, ASPCA. is liable to the plaintiff for the discriminatory conduct engaged in

        by its employees and agents, including but not limited to the named individual defendants

        Dara Ruiz and Colleen Doherty.

121.    Defendants Dara Ruiz and Colleen Doherty exercised managerial and/or supervisory

-17-

responsibility over Caitlin Byrne and her employer, ASPCA knew of their defendant employees' and agent's discriminatory conduct ,and acquiesced in such conduct and failed to take immediate and appropriate corrective action.

122.    Plaintiff's employer, ASPCA should be deemed to have knowledge of its employees' and agents' discriminatory conduct because that conduct was open and notorious; and the employer , ASPCA should have and did in fact know of the employees' and agents' discriminatory conduct and failed to exercise reasonable diligence to prevent such discriminatory conduct.

123.    As a direct consequence thereof, the plaintiff has been damaged: among other harms she endured, she suffered from emotional harms including anxiety, distress, depression, suicidal ideation, and panic attacks and was at one point hospitalized for 8 hours as a result, she had a difficult time focusing at work, and was ultimately fired from her job, resulting in a three month period of unemployment, she was unable to sleep at night, she lost her appetite, and it was difficult for her to work.

124.    The plaintiff is therefore entitled to compensatory damages in an amount not to exceed ONE MILLION ($1,000,000.00) DOLLARS she is entitled to an award of punitive damages in an amount to be decided upon by the trier of fact and she is entitled to an award of reasonable attorneys' fees and costs pursuant to New York City Administrative Code §8-502(a & g).

**AS AND FOR A FIFTH CLAIM FOR RELIEF
ON BEHALF OF PLAINTIFF
<u>CONSTRUCTIVE TERMINATION</u>**

125. Plaintiff repeats, reiterates, and realleges each and every allegation contained in the prior paragraphs with the same force and effect as is more fully and at length set forth herein.

126. Plaintiff was constructively discharged by her employer, who rather than discharging her directly, defendants intentionally created a work atmosphere so intolerable that she was forced to quit involuntarily.

127. Plaintiff's work conditions were so intolerable, when viewed as a whole, that no reasonable person in her shoes would not have felt compelled to resign.

128. As a direct consequence thereof, plaintiff has been damaged; among other harms she endured pecuniary damages; she has been emotionally harmed; her career path was interfered with; her employment record has been damaged; she has been humiliated and there have been physical repercussions to defendants' treatment of Ms. Byrne and severe emotional trauma and she was forced to resign.

129. The plaintiff therefore is entitled to compensatory damages in an amount not to exceed ONE MILLION ($1,000,000.00) DOLLARS she is entitled to an award of punitive fees in an amount to be determined by the trier of fact and she is entitled to the costs attributed to the prosecution of this action.

### AS AND FOR A SIXTH CAUSE OF ACTION
### ON BEHALF OF PLAINTIFF
### AGAINST INDIVIDUAL DEFENDANTS FOR VIOLATING
### PLAINTIFF'S RIGHTS UNDER THE ADMINISTRATIVE
### CODE OF THE CITY OF NEW YORK §8-107 (6) et seq.

130. Plaintiff repeats, reiterates, and realleges each and every allegation contained in the prior paragraphs with the same force and effect as is more fully and at length set forth herein.

131. By the actions described, plaintiff was deprived of her rights secured by New York City

Administrative Code §8-107 (6).

132. Plaintiff was deprived of her right to be free from discrimination based on race in that by the actions described, the defendants jointly and severally aided, abetted, incited, compelled and coerced the performance and attempted performance of acts forbidden under the Administrative Code § 8-107 (1)(a) resulting in plaintiff being subjected to disparate and worse treatment premised on her race.

133. Supervisors and HR at ASPCA aided in the harassment by ignoring Ms. Byrne's plea for help with the situation; they were aware of the consistent harassment, but did nothing to stop it, and they actively worked together to abet against the plaintiff through fictitious write-ups.

134. The senior director of the plaintiff's department, defendant Doherty, was aware of the harassment but failed to provide any resources or solutions for the plaintiff, including purposefully keeping her from transferring out to a different department.

135. Defendant Doherty ignored defendant Ruiz and defendant Doherty's discriminatory treatment of the plaintiff, and allowed for defendant Ruiz, a manager, to conspire with defendant Vitale, the HR representative on how to best retaliate and discriminate against the plaintiff.

136. In meetings in which defendant Ruiz's supervisors were present and actively ignoring the plainitff's ideas or contributions, defendant Ruiz purposefully ignored and participated in their behavior and would dismiss plaintiff's concerns afterwards stating "they did not hear her".

137. As a direct consequence thereof, the plaintiff has been damaged: among other harms she

endured, she suffered from emotional harms including anxiety, distress, depression, suicidal ideation, and panic attacks and was at one point hospitalized for 8 hours as a result, she had a difficult time focusing at work, and was ultimately fired from her job, resulting in a three month period of unemployment, she was unable to sleep at night, she lost her appetite, and it was difficult for her to work.

138.   The plaintiff therefore is entitled to compensatory damages amounts not to exceed ONE MILLION ($1,000,000.00) DOLLARS and punitive damages in amounts to be determined by the trier of fact and she is entitled to an award of reasonable attorneys' fees and costs pursuant to New York City Administrative Code §8-502(a & g).

**WHEREFORE,** Plaintiff respectfully request that judgment be entered as follows:

(A)   Declaratory relief finding that Plaintiff's rights under 42 U.S.C. §2000e-2(a) (1 & 2) and the NYC HRL § 8-107 et seq. were violated;

(B)   Compensatory damages to be determined at trial in a sum of not more than ONE MILLION ($1,000,000.00) DOLLARS.

(C)   By reason of the wanton, willful and malicious character of the conduct complained of herein, punitive damages against the defendants in amounts to be determined by the trier of fact at trial;

(D)   An award to plaintiff of the costs and disbursements herein;

(E)   An award of attorneys' fees pursuant to 42 U.S.C. § 2000e-5(k) for Title VII violations and pursuant to New York City Administrative Code §8-502(a & g). ; and

(F)     Such other and further relief as this Court may deem just and

proper.

Dated: November 19, 2022
       New York, New York

_____ / s / _____
Fred Lichtmacher
The Law Office of Fred Lichtmacher, PC
Attorneys for Plaintiff
116 West 23rd Street, 5th Floor
New York, York 10011
(212) 922-9066

To:     Dara Ruiz, Colleen Doherty & Antonia Vitale
        American Society for the Prevention of Cruelty to Animals (ASPCA)
        424 E. 92nd Street
        New York, NY 10128-6804