UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
CAITLIN BYRNE,                                         :
                                    Plaintiff,         :
                                                       :     **CORRECTED**
                      -against-                        :     **MEMORANDUM DECISION AND**
                                                       :     **ORDER**
AMERICAN SOCIETY FOR THE                               :
PREVENTION OF CRUELTY TO ANIMALS,       :     22-cv-7062 (BMC)
(A.S.P.C.A.); DARA RUIZ; COLLEEN                 :
DOHERTY; and ANTONIA VITALE,                     :
                                                       :
                                    Defendants.        :
------------------------------------------------------------ X

**COGAN**, District Judge.

Plaintiff's Title VII hostile work environment claim can be summed up in one sentence from her affidavit in opposition to defendants' summary judgment motion: "Juxtaposed with my treatment in group settings and even when trying to say hello to supervisors as everyone else did, it was clear to me that I was being treated differently and worse than the non-Black employees." Plaintiff may have felt that way, but she has no evidence that any differential treatment was racially based. At most, she's made a case that she was not favorably viewed at work, fairly or not. Her affidavit alludes to a "racially driven, inappropriate comment about the texture of [her] hair" made by a supervisor outside of her department, which her own supervisor treated dismissively when plaintiff reported it, but standing alone, a stray remark by a non-decisionmaker is legally insufficient to raise a factual issue of hostile work environment.

There is no other comment or statement by defendants noting plaintiff's race in the rest of the record aside from plaintiff's own interpretation of the source of the constant friction between her and her supervisors. Thus, the rest of plaintiff's argument is based on her feeling that she was not treated nicely – she calls it "microaggressions" (a term used repeatedly in her submissions) – and because there were many more white than black employees at the ASPCA,

the not-nice treatment must have been based on her race.  She complains that her supervisors

gave her dirty looks; would not say hello to her; criticized or ignored her ideas in group settings;

refused her request to work remotely; gave her an undesirable assignment; did not give her the

opportunity to lead events that were supposed to be assigned on a rotating basis; and on one

occasion, asked her if she was the one responsible for some kind of verbal harassment (we are

not told about what) directed at her by workers for a third-party garbage collection service.  She

conclusorily asserts that to the best of her knowledge, these things didn't happen to white

workers, but despite discovery, she offers no quantification or specific identification of

comparable white workers to support that – just her opinion.  As close as she gets are the

inadmissible opinions of a few other workers who agree with her that white workers are treated

better, but their opinions suffer from the same lack of substantiation as plaintiff's.

No reasonable jury could find that plaintiff's sense of racial victimization as opposed to

workplace friction is borne out by the evidence in this record.  Accordingly, defendants' motion

for summary judgment is granted as to her Title VII claim, and the Court will order the parties to

show cause why it should continue to exercise supplemental jurisdiction over her local law

claims.

## BACKGROUND

The following undisputed facts are taken from defendants' Local Rule 56.1 statement as

well as the evidentiary submissions submitted with the motion, all viewed in the light most

favorable to plaintiff.[1]

---

[1] Like the parties' other submissions in this case, defendants' Rule 56.1 Statement was poorly executed and created unnecessary work for the Court.  Despite this being a simple employment discrimination case, the Rule 56.1 submission had 205 statements of allegedly undisputed facts.  Many of these are irrelevant.  Many others set forth defendants' characterizations of events and defendants' motivations in taking certain actions that practically begged plaintiff to dispute them.  Plaintiff's response was not much better.  And neither party, in their briefs or their other submissions, made any effort to differentiate facts that pertain to the sole Title VII claim as opposed to the five New

The ASPCA provides an array of services to New York City residents, businesses, and public agencies, some through its Humane Law Enforcement ("HLE") department.  One of the agencies with which the HLE works closely is the NYPD, responding to reports of criminal conduct concerning animals.  Many of HLE's senior managers or officers are former NYPD personnel.

Within the HLE department, the ASPCA has a Community Engagement ("CE") program.  That program, among other things, works with pet owners who are having trouble caring or maintaining a safe environment for their pets.  The CE program is staffed with coordinators ("CECs"), who provide training, conduct outreach, engage in field work, and maintain relationships with partner agencies like the NYPD.

Plaintiff applied for a CEC job because of the ASPCA/NYPD connection; her father was an NYPD captain and had a relationship with another police officer who was very close to plaintiff and became a senior director of HLE.  Plaintiff was initially unsuccessful in applying for a paying job with the agency, principally because her background was in data analytics.  Nevertheless, upon the advice of her father's friend, she volunteered for about two years at the ASPCA, and then, after applying for a newly opened CEC position, she was hired.[2]

Plaintiff's direct supervisor was defendant Dara Ruiz, who was the Senior Manager of Community Engagement.  Ruiz reported to non-defendant Erin Earley, who was the Director of

---

York City law claims, which was important because they revolved upon largely different evidence. Moreover, the Title VII claim is clearly the tail of this case, and the New York City law claims are the dog.

[2] Defendants waste time trying to establish that they were reluctant to hire plaintiff, that there were better qualified candidates, and the parties argue over whether defendants hired her only because of her NYPD/family connection. Defendants' motivation in hiring her presents an issue of fact.  Fortunately for defendants as it pertains to this motion, it is immaterial, because by hiring her, they have admitted that she was qualified to do the job.  The only question is how she performed after she was hired.

Community Engagement.  Earley reported, in turn, to defendant Colleen Doherty, who was Senior Director of Community Engagement.

Ruiz had issues with plaintiff's performance virtually from the start.  In her first annual review, there were some areas identified as accomplishments, but there were more specific deficiencies noted, and overall, Ruiz gave her an "MSE" grade, which means "Meets Some, But Not All Expectations."  That is the second from the lowest of the five-tiered ranking system that the ASPCA uses.  In her affidavit in support of defendants' motion, Ruiz has asserted that when she met with plaintiff to discuss the evaluation, plaintiff took the criticism poorly, becoming tearful and seeking to blame others for her shortcomings.[3]  This became a pattern virtually any time Ruiz would criticize (plaintiff's characterization) or suggest improvement in (defendants' characterization) plaintiff's performance of aspects of her job.  And there was quite a lot of criticisms/suggestion for improvement.

Plaintiff's second annual review was better, a level higher – "Fully Meets Expectations."

In spring 2020, in response to the COVID-19 pandemic and the murder of George Floyd, the ASPCA's Human Resources department offered to speak with any employees who so wished.  Plaintiff requested a meeting with Kim Ferguson, the Director of People Partnership. At the meeting, plaintiff "discussed her feelings of discomfort and marginalization as a mixed-race woman with a family connection with the NYPD."  Ferguson subsequently asked plaintiff to share their discussion with the Senior Director of People Partnership "to ensure that [plaintiff] would have a more inclusive environment in meetings, team meetings at CE, and to make sure [plaintiff] had a safe space."  Plaintiff declined.

---

[3] Plaintiff admits that "there were a few occasions where she became emotional during her meetings with Ruiz, but denies that it was due to performance feedback," and she denies "refocusing the discussion on others," but "she did voice her side or plead an explanation" because she "was frequently blamed for, or criticized for events involving other CEC employees without the supervisors allowing [plaintiff] to voice her side or experience of conversations."

Later in 2020, defendant Antonia Vitale became the manager of the Human Resources department at the ASPCA. By that time or near it, plaintiff's relationship with Ruiz and her indirect supervisors had fallen off a cliff. Vitale met with plaintiff and Ruiz separately and then together for two sessions in an effort to mediate their inability to get along. The mediation failed, and plaintiff continued to feel that she was being treated poorly. But the parties reached some understanding of how to go forward. Notably, at no time during this uncomfortable process did plaintiff express the view that her perception of Ruiz's antipathy towards her was based on race.

In November 2021, after repeated incidents that, according to Earley, Ruiz, and Doherty (but not plaintiff) constituted non-compliance with procedures and protocols, they decided to put plaintiff on a performance improvement plan (the "PIP"). On December 9, 2021, Doherty, Ruiz and Vitale met with plaintiff to so advise her. Going into the meeting, plaintiff thought she was going to be fired and decided to record the meeting. Shortly after the meeting, plaintiff had a panic attack and called an ambulance that took her to a local hospital. Within a short time after her hospitalization, plaintiff advised defendants that she would not be reporting to work for health-related reasons, and she has acknowledged in this action that she had no intention of ever returning to work.

Four days after her panic attack, plaintiff sent a letter to the CEO of the ASPCA laying out her grievances. The ASPCA undertook an internal investigation, and plaintiff was interviewed the next day. She acknowledged to the investigator that she knew of no specific incidents of racial discrimination, just her feeling that "Caucasians or Hispanics … are just treated significantly better than me." Plaintiff stayed on the payroll for more than two months. Her job as a CEC remained open to her. The ASPCA concluded its investigation, found no

evidence of a violation of its anti-discrimination policy, and so advised plaintiff. But it didn't fire her. Quite the contrary.

Plaintiff learned that Ruiz had been promoted and was no longer working in CE. Plaintiff was also advised that if she returned to work, the PIP would be lifted, and she could return to work with a "clean slate." Neither Ruiz nor Doherty were involved in the decision to withdraw the PIP nor do either of them know why it was withdrawn.

On March 24, 2022, plaintiff wrote to some of her colleagues that she was going to graduate school to get a certificate in data analytics and would be leaving the ASPCA.

Her complaint in this action contains six claims. The first is for "hostile work environment . . . including discrimination" under Title VII. The fifth is for constructive termination, although it is unclear under which statute plaintiff brings this claim. The remainder are for discrimination, retaliation, and aiding and abetting under New York City law. Discovery having closed, defendants have moved for summary judgment.

## DISCUSSION

## I.    Hostile Work Environment under Title VII

A hostile work environment is one "permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (internal quotation marks and quotations omitted). A plaintiff must show that "the complained of conduct: (1) is objectively severe or pervasive – that is, creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's" protected characteristics or protected activity. Patane v. Clark, 508

F.3d 106, 113 (2d Cir. 2007) (quotation omitted) (cleaned up).  "Factors that a court might consider in assessing the totality of the circumstances include: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is threatening and humiliating, or a mere offensive utterance; and (4) 'whether it unreasonably interferes with an employee's work performance.'"  Id. (quoting Harris, 510 U.S. at 23).

On a motion for summary judgment, the non-moving party "must present concrete particulars and cannot succeed with purely conclusory allegations." Cadle Co. v. Newhouse, No. 01-cv-1777, 2002 WL 1888716, at *4 (S.D.N.Y. Aug. 16, 2002) (internal quotation marks and quotation omitted); see also Cameron v. Cmty. Aid for Retarded Children, Inc., 335 F.3d 60, 63 (2d Cir. 2003) ("[p]urely conclusory allegations of discrimination" insufficient to defeat summary judgment motion (quotation omitted)).  "Personal speculation is insufficient as a matter of law to raise an inference of discrimination."  Boise v. N.Y. Univ., No. 03-cv-5862, 2005 WL 2899853, at *4 (S.D.N.Y. Nov. 3, 2005) (citation omitted).

Plaintiff does not come near to meeting this standard.  Assuming arguendo that plaintiff subjectively found the conduct directed at her to be hostile and abusive, she has not raised an issue that any objective person would regard it similarly.

First, over the two years during which plaintiff alleges she was subject to a hostile work environment, she can only point to two offensive comments that could, generously construed, relate to her race.  According to plaintiff, a supervisor in another department told plaintiff that her hair looked damaged and that she should fix it, referring to the "edges" of plaintiff's hair, which plaintiff alleges are "a common characteristic of Black people's textured hair."  Plaintiff has also alluded to a "harassing" remark made by one or more garbage collectors apparently who worked for a service under contract with the ASPCA, remarks which her supervisor chose not to

pursue on her behalf.  But she hasn't told us what that remark was.  It's impossible to find that these two remarks contributed to a hostile work environment when this Court does not even know what one of the remarks was, and the only other remark was made one time by an individual outside plaintiff's department.  The "mere utterance of an epithet which engenders offensive feelings in an employee . . . does not sufficiently affect the conditions of employment to implicate Title VII."  Harris, 510 U.S. at 21 (quotation omitted) (cleaned up).

That leaves us, then, with a series of petty slights in the workplace, to which she believes white employees were not subjected – *e.g.*, dirty looks, not saying hello in the morning, not letting her speak up at meetings – things like that which she calls "microaggressions."

Plaintiff's opinions and conclusions that whites and Hispanics were not subject to these microaggressions is an inadequate basis to create a factual issue about a hostile work environment.  It is only plaintiff's opinion that the ASPCA treats black employees worse than non-black employees.  Her opinion is not even admissible evidence because it is just that – her opinion and conclusion – and opinion evidence from a layperson, a summing up of the impressions that a worker draws about the work environment, is not admissible in a hostile work environment case.  Plaintiff has not provided any other evidence that any conduct she experienced occurred "because of" her race.  See Browne v. New York State Dep't of Corr. & Cmty. Supervision, No. 24-734, 2025 WL 1177958, at *1 (2d Cir. April 23, 2025) (quoting Agosto v. N.Y.C. Dep't of Educ., 982 F.3d 86, 102 (2d Cir. 2020) (affirming grant of summary judgment for defendants because plaintiffs could not demonstrate that any complained of conduct occurred because of their race)).

Judge Chin considered a similar hostile work environment claim in Sharpe v. MCI Communication Services, Inc., 684 F. Supp. 2d 394 (S.D.N.Y. 2010).  There, the plaintiff's

claim was based on his supervisor being mean to him.  Judge Chin held that meanness in the

workplace and an opinion that there was less meanness towards employees in a non-protected

class were not sufficient to survive summary judgment on a hostile work environment claim:

> Sharpe's subjective belief, unsupported by any concrete facts or particulars, that
> Fabiitti was "nasty" and "mean" when it came to people of color is insufficient to
> defeat summary judgment.  The fact that Fabiitti did not yell at four white
> employees who might or might not have worked for him proves nothing.  Further,
> Sharpe's argument is undermined by his admission that Fabiitti never made any
> derogatory racial comments, and the fact that in all of his complaints against
> Fabiitti, Sharpe never once mentioned race discrimination.

Id. at 400-01 (cleaned up).

Similar to Sharpe, our plaintiff attempts to buttress her opinion by offering the opinions

of a few other ASPCA employees or former employees who share similar opinions, or who think

she was doing a good job and thus the criticism of plaintiff must have been based on her race, but

their opinions are no more probative or admissible than hers.  See Smith v. New York &

Presbyterian Hosp., 440 F. Supp. 3d 303, 339 (S.D.N.Y. 2020); Di Giovanna v. Beth Israel Med.

Ctr., 651 F. Supp. 2d 193, 202 (S.D.N.Y. 2009) (footnote omitted).

Defendants, for their part, have confused the matter further by attempting to treat

plaintiff's evidence from these witnesses as "comparator" evidence.  Defendants do not

understand the difference between witnesses and comparators.  These witnesses are not

"comparators" and plaintiff has not offered their testimony for that purpose.  Comparator

evidence, much more commonly used in discrimination than in hostile work environment claims,

looks at the qualifications of co-employees who have received promotions or salary

advancements that employees in a protected class with better qualifications have not.  See

Graham v. Long Island R.R., 230 F.3d 34, 39-40 (2d Cir. 2000); Quarless v. Bronx-Lebanon

Hosp. Ctr., 228 F. Supp. 2d 377, 383 (S.D.N.Y. 2002), aff'd, 75 F. App'x 846 (2d Cir. 2003).

That is not what is going on here at all.  Plaintiff does not offer an objective comparison of her qualifications and performance to anyone else's outside her class.  She simply feels that her supervisors were nicer to people outside her protected class and has offered the testimony of others who feel they were also not treated nicely because of their race.

The problem with plaintiff's witnesses is not that they are inadequate comparators, as defendants misconstrue them, but that they offer no probative evidence of hostile work environment or discrimination.  For example, plaintiff relies on Dr. LaCheryl Ball, a veterinarian who is black.  Dr. Ball testified at her deposition that an unidentified manager told her at some unspecified time not to apply for a promotion because, as to that position, "I wouldn't be a good candidate and they didn't think I would like the job."  The position was still open as of the date of Dr. Ball's deposition.  There is another one of those positions that is held by an unidentified white person who has the same amount of time at ASPCA as Dr. Ball.  Dr. Ball's opinion is that they have "similar" experience, but since we aren't told who that person is or what their or Dr. Ball's experience is, we can't make a judgment as to whether Dr. Ball is right that they their experience is "similar."

I would not allow a jury to hear this testimony and so I cannot consider it on summary judgment.  It would be precluded under Federal Rule of Evidence 401 and 403, and since we cannot identify the speaker who Dr. Ball is quoting, Federal Rule of Evidence 801.  That there is one white person who holds a position and one black person who does not is irrelevant.  There is no indication that they ever competed with each other to get the position; if anything, the inference is to the contrary.  Whoever the unidentified person is who made the hearsay statement, telling Dr. Ball she wouldn't be a good candidate, does not permit an inference that the advice given to Dr. Ball was based on her race.  And whoever the unidentified person was, it

does not appear to have been one of plaintiff's supervisors, as Dr. Ball does not work in the CE department, or at least plaintiff hasn't told us that she does.[4]

Subjective evaluation alone cannot constitute a hostile work environment; if it could, then summary judgment would never be available in a hostile work environment case. Yet that is all plaintiff offers. For example, she states: "Shortly after I was hired, I began noticing microaggressions aimed towards me at the hands of my supervisors. . . ." She then lists general incidents, without reference to specifics, like being ignored, and says, "I never witnessed [my supervisor] do [that] with similarly situated non-Black employees." Those repeated conclusory assertions fall far short of a hostile work environment.[5]

On an objective basis, the conduct of which plaintiff complains was not frequent; it was not threatening, humiliating, or even objectively offensive; and nothing her supervisors did should have interfered with her work save for subjective sensitivity to it. Plaintiff cites not a single federal case finding a comparable environment as hostile because there are none. Even seen collectively, these are "petty workplace grievances," Morales v. North Shore, No. 17-cv-6518, 2019 WL 13409226, at *7 (E.D.N.Y. Jan. 16, 2019), that no reasonable jury could find were based on plaintiff's race.

---

[4] Plaintiff's other witnesses also fail to offer any relevant evidence. Isadora Peraza-Martinez, who worked at the ASPCA for nine years, testified Ruiz ignored her one time, briefly withheld an address for a car wash from her, gave her unspecified complaints, and on one occasion mocked Dr. Ball's name "LaCheryl." From this, Peraza-Martinez concludes, like plaintiff, that she was treated less favorably. Shadina Arnett, who still works for ASPCA, actually disclaimed any racial animus from her managers. Brandon Greene was fired after more than one complaint of sexual harassment by an employee over whom he had supervision.

[5] Much of plaintiff's evidence is also inadmissible hearsay. She complains, for example, that she was assigned to pick up a dead animal, and asserts that "af[t]er speaking to other team members, [I] learned that no one new to the job had ever been sent to do something like that, especially not alone." Aside from the vagueness of the statement, the alleged statements of her unidentified "team members" are hearsay, and cannot be considered on a summary judgment motion. See Fed. R. Civ. P. 56(c)(4). Making it worse, her supporting witnesses, besides offering their opinions, do the same thing, offering hearsay based on things they supposedly learned from other unidentified people.

## II.    Constructive Discharge under Title VII

Plaintiff includes a claim of constructive discharge, but does not specify whether this claim is pursuant to Title VII or a New York state or city statute.  This confusion is not worth dwelling on, because defendants would be entitled to summary judgment on a Title VII constructive discharge claim in any event.

"A constructive discharge occurs when an employer 'intentionally creates a work atmosphere so intolerable that [the plaintiff] is forced to quit involuntarily.'"  Borski v. Staten Island Rapid Transit, 413 F. App'x 409, 411 (2d Cir. 2011) (quoting Terry v. Ashcroft, 336 F.3d 128, 151-52 (2d Cir. 2003)).  This "standard is higher than the standard for establishing a hostile work environment."  Fincher v. Depository Trust and Clearing Corp., 604 F.3d 712, 725 (2d Cir. 2010) (reasoning that because the plaintiff did not establish a hostile work environment, "her claim of constructive discharge also fails").  As no reasonable jury could find for plaintiff on her hostile work environment claim, plaintiff's constructive discharge claim fails as well.

## III.    Racial Discrimination under Title VII

It is not at all clear that plaintiff is seeking to bring a claim for racial discrimination under Title VII, as the only references to Title VII in the complaint are in the context of a "hostile work environment riddled with racial prejudice including discrimination," and plaintiff's brief in opposition to defendants' motion does not discuss or even identify the standard for a Title VII racial discrimination claim at all.  Nevertheless, since plaintiff's complaint uses the word "discrimination" in her Title VII claim, I will address it.

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Courts

analyzing discrimination claims under Title VII apply the three-step burden-shifting framework originally established by McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Ruiz v. Rockland County, 609 F.3d 486, 491 (2d Cir. 2010); Graham, 230 F.3d at 38.

In the first step, a Title VII plaintiff must establish a *prima facie* case of discrimination. Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981). The establishment of a *prima facie* case creates an inference of discrimination. To establish a *prima facie* case, a plaintiff must demonstrate that "(1) she was within the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination." Walsh v. New York City Hous. Auth., 828 F.3d 70, 75 (2d Cir. 2016) (quotation omitted). Second, "[i]f the plaintiff successfully establishes a *prima facie* case, 'the burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment action.'" Id. (quoting United States v. Brennan, 650 F.3d 65, 93 (2d Cir. 2011)). Third, "[i]f the employer carries that burden, 'the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination.'" Id. (quoting Feingold v. New York, 366 F.3d 138, 152 (2d Cir. 2004)).

We need not tarry beyond the first McDonnell Douglas step, as plaintiff has not even attempted to show a *prima facie* case. In fact, the term "adverse employment action" (the third factor for a *prima facie* case) appears only once in plaintiff's opposing memorandum, and that in the context of an Appellate Division decision construing the New York City Local Civil Rights Restoration Act of 2005 (the "NYC Restoration Act"), under which she brings the remainder of

her claims in this case – not Title VII.  See Bennett v. Health Mgmt. Sys., Inc., 92 A.D.3d 29, 936 N.Y.S.2d 112 (1st Dep't 2011).

Even if plaintiff is attempting to raise a Title VII discrimination claim, she has pointed to no adverse employment action.  Of course, she has asserted a constructive discharge claim under state law, and a constructive discharge could be an adverse employment action.  See Noh v. Admarketplace, Inc., No. 24-cv-2107, 2025 WL 965882, at *5-6 (S.D.N.Y. March 28, 2025). But since I have found that her hostile work environment claim fails, any constructive discharge claim under Title VII would also fail *ipso facto*.  Cf. Chenette v. Kenneth Cole Prods., Inc., 345 F. App'x 615, 620 (2d Cir. 2009) ("Having failed on her hostile work environment claim, [plaintiff] can neither survive summary judgment on her constructive discharge claim, which requires evidence of even more severe conditions." (internal quotation marks and quotation omitted)).  In addition, when an employee turns down alternative avenues within the organization to remove her from the allegedly discriminatory environment and instead resigns, she cannot claim a constructive discharge under Title VII.  See Miller v. Praxair, Inc., 408 F. App'x 408, 410-11 (2d Cir. 2010) (voluntary resignation not amounting to constructive discharge or hostile work environment did not constitute an adverse employment action); Cooper v. Wyeth Ayerst Lederle, 106 F. Supp. 2d 479, 495 (S.D.N.Y. 2000) ("An employee who fails to explore alternative avenues offered by her employer before concluding that resignation is the only option cannot make out a claim of constructive discharge." (citations omitted)).

Thus, if plaintiff is attempting to bring a Title VII discrimination claim, it is dismissed.

## IV.    State Law Claims

It is apparent both from plaintiff's complaint and plaintiff's brief in opposition to defendants' motion for summary judgment that plaintiff's arguments have always been much

more focused on her New York City law claims than her Title VII claim.  There is only one Title

VII claim and, as shown above, it is ill-defined and extremely weak.  There are five New York

City Law claims that seek to apply the NYC Restoration Act and Human Rights Law.  The local

law claims, because they include conspiracy, retaliation, and individual liability theories that the

Title VII claim does not, introduce a far broader array of factual and legal issues than raised by

the undisputed facts set forth above, and as plaintiff repeatedly emphasizes in her brief, the

determination of those claims will require a deliberately more lenient standard of proof than Title

VII.  Plaintiff's memorandum in opposition references Title VII only twice, and that for the

unremarkable proposition that an employer can be held liable if it takes no action in response to

an employee complaint of racial discrimination (and, again, plaintiff does not even allege a

racially discriminatory adverse employment action here under Title VII).  There is no separate

discussion of the requirements for meeting any Title VII claim anywhere in her opposition

papers.

        The supplemental jurisdiction statute, 28 U.S.C. § 1367(c), provides that a court may

decline to exercise supplemental jurisdiction if either the state law claim "substantially

predominates over the claim or claims over which the district court has original jurisdiction," id.

§ 1367(c)(2), or if "the district court has dismissed all claims over which it has original

jurisdiction," id. § 1367(c)(3).  The Second Circuit has made clear that, generally, "if [all] federal

claims are dismissed before trial . . . the state claims should be dismissed as well."  Motorola

Credit Corp. v. Uzan, 388 F.3d 39, 56 (2d Cir. 2004) (quotation and citation omitted).  Indeed,

"courts regularly dismiss state-law claims once a motion for summary judgment disposes of all

federal claims."  Muslim v. Sagamore Children's Psychiatric Ctr., No. 22-cv-07850, 2024 WL

3431959, at *12 (E.D.N.Y. July 15, 2024) (citations omitted).  Yet concluding that there are no

remaining federal claims is not the end of the inquiry; otherwise, § 1367(c) would not be discretionary at all.

The parties will therefore be ordered to show cause why the Court should maintain supplemental jurisdiction, unless they agree that this state law matter belongs in state court.

### CONCLUSION

Defendants' motion for summary judgment is granted as to plaintiff's Title VII claim (the first claim in the complaint). The parties are ORDERED TO SHOW CAUSE within 14 days why the Court should not decline to exercise subject matter jurisdiction over plaintiff's remaining five claims.

**SO ORDERED.**

*Brian M. Cogan*
_____
U.S.D.J.

Dated: Brooklyn, New York
       June 3, 2025